UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, et al. *v.* PASCAGOULA VENEER COMPANY

No. 40233          October 8, 1956          89 So. 2d 711

*Charles S. Mitchell,* Pascagoula; *Jackson & Ross,* Jackson, for appellants.

*Morse & Morse,* Gulfport, for appellee.

LEE, J.

Pascagoula Veneer Company, a Delaware corporation, doing business at Pascagoula under the Agricultural and Industrial Program in this State, on November 1, 1955, by its bill of complaint, sought an injunction to restrain and enjoin certain named defendants, and officers and agents and all other persons acting in concert with them, and all striking employees participating in a strike from picketing its plant and molesting or interfering with its employees. The International Brotherhood of Carpenters and Joiners of America, and B. R. Upton, W. C. Oliver and Frank Garner, its alleged representatives, and R. C. Dubose, John Stallworth, Clyde Houston, Jr., Eugene Smith, Masie Lidell, Mamie Simmons, Viola Mims, Blanche Johnson, Rebecca Leroy and Willie Belle McMillan, residents of Jackson County, were made defendants. On the same date, the chancellor ordered the is-

suance of a temporary injunction, and the writ therefor was issued by the clerk and directed to the named defendants, commanding them to desist from picketing in any manner whatsoever at or near the plant of complainant or the entrance thereto, and from wearing or showing placards or signs, and from threatening and committing violence against any present or future employee of the complainant.

The return of process showed service on the International Brotherhood of Carpenters and Joiners of America "by personally handing its representatives E. R. Upton. W. C. Oliver, R. C. Dubose, John Stallworth, Clyde Howard, Jr., Eugene Smith, Macey Lidell, Viola Sims and Rebecca Leroy, each a true copy of this writ." Frank Garner, Mamie Simmons, Blanche Johnson and Willie Belle McMillan were not found in Jackson County.

On November 10, 1955, B. R. Upton and others, all individual defendants except Blanche Johnson, who was not served with process, together with C. S. Eshee, James L. Perry, Edner Mae Kelly and Jim Ehlers, not named as defendants, filed their sworn answer. It was averred that there was no such organization as the International Brotherhood of Carpenters and Joiners of America, but there was an organization known as United Brotherhood of Carpenters and Joiners of America, with its principal offices at Indianapolis, Indiana, with M. A. Hutcheson, 222 E. Michigan Street, Carpenters Building, Indianapolis 4, Indiana, as President; that B. R. Upton and Frank Garner were representatives of the Union, but only of limited authority, on whom no proper process for the Union could be served, but they entered their appearance as individual defendants; that W. C. Oliver was the business agent of Local Union No. 569, chartered by the United Brotherhood of Carpenters and Joiners of America, but this local union had no connection with the plant of the complainant; and that the other defendants were members and officers of Local No. 3056, chartered

by United Brotherhood of Carpenters and Joiners of America, with C. S. Eshee as President, James L. Perry, Vice President, Mamie Simmons, Recording Secretary, Edner Mae Kelly, Financial Secretary, and Jim Ehlers, Treasurer. And on the same date, the answering defendants filed their motion to dissolve.

On November 17, 1955, the complainant, after leave of court, filed its motion to amend by making as party-defendants, Union Brotherhood of Carpenters and Joiners of America, with M. A. Hutcheson as President, and at the same address given in the answer; Local Union No. 569, with its business agent as W. C. Oliver; and Local Union No. 3056, with the officers also named in the answer to the bill of complaint. No process of any kind was issued following the amendment.

On the same date, November 17, 1955, the court proceeded with a hearing of the controversy. The evidence showed that the National Labor Relations Board on June 28, 1954, certified United Brotherhood of Carpenters and Joiners of America, AFL, as exclusive representative of the employees of the Pascagoula Veneer Company, which was an open shop. Local No. 3056 thereof was set up for the employees of the Veneer Company. It was a mixed union of ninety to one hundred members. Between fifteen and twenty were white man and women, and the rest, mostly women, were colored. Local No. 569 was also an affiliate of the parent union. There was, however, no connection between these locals, except that they were affiliates of the same parent union. As the result of a labor controversy, Local No. 3056 voted to strike, and, on October 27, 1955, threw up a picket line around the plant.

There was proof that groups of striking employees, acting in concert with the pickets, stationed themselves on the opposite side of the street and at a small cafe and at a nearby store, and accosted and threatened returning or potential workers, many of whom wished to work.

The majority of these groups were colored women. A number of acts of violence were testified to: A car coming up behind the car in which Mrs. Leda Pearl Danley drove her husband, a nonstriking fireman, to work late one night, pushed her car from one end of the mill to the other. James Perry, an officer of Local No. 3056, was on the picket line at the time. A "bunch" of colored men, threatening Tommie Danley, a one-armed white worker, told him that he had better stay out of the plant. Three strikers threw bricks into the superintendent's car, which Sam Bishop was driving, and later went to Bishops' home and damaged his car. Four men followed Minnie Lou Hall Taylor, a niece of Sam Bishop, and tried to break windows out of his home. The four tires of the automobile of John Ezell, who continued to work, were cut with a knife. As Jesse Kennedy, a worker, was riding home in the company's truck, Elliott Nicholson, a striker, in a following car, pointed a gun at the truck, and he and others threatened to burn Kennedy's house. Elliott Nicholson and John Williams threw bricks into John Gambrell's car near the plant about eleven o'clock one night. Nicholson had been walking the picket line. Johnie Williams, a striker, threatened to whip Robert Lett, if he went into the plant. As J. C. Zimmerman passed a crowd of strikers, a bottle or brick was thrown into his car, and two cars followed him for a distance. As Mary Blanche Dean, a white girl, went to get a cold drink for her father, who was working in the plant, seven Negro women said, "Girl, you crossed the picket line", and accused her of trying to get their jobs. As she walked away, Winnie B. Anderson, a striker, threw a large rock at her. As Nathaniel Puryear left the plant, R. C. Dubose and other strikers opposite the plant followed and threw bottles at him. Ella Lee Molden, a new worker, was chased and hemmed up by two cars, and was cursed and warned by Masie Lidell and Viola Sims, strikers, to stay out of the mill. Mamie Simmons, an officer of the

union, was driving the other car. Viola Sims served as a picket.

The parties against whom these incidents were charged offered their denials.

W. C. Oliver testified that he asked the committee and other people not to have any violence. The strikers were largely colored. With white people accepting jobs, he considered the situation explosive. Consequently he sought police supervision. He admitted that he advised and consulted with the strike committee after B. R. Upton had left town.

B. R. Upton was on the ground from the 27th until the 29th, while the strike was in effect. He testified that he counseled peace and against violence, and with reference to a discussion with the city authorities in an effort to avoid violence. While protesting that he was not guilty of any untoward act, it was a disputed issue as to whether a controversy between him and the owner of the plant arose over the pay-off of the employees, or constituted a threat in connection with the strike. Because of his presence in and about the scene, the evidence warranted the court in finding that he must have known of the situation, and either incited the threats of violence, or aided and abetted therein. Frank Garner was also in and about the plant from 10 A. M. until 6:30 P. M. on Friday, the second day of the strike.

Complaint was made to Barney Matthews, Chief of Police, about several incidents, but he said that he was unable to establish a sufficient identification of the offending parties to warrant criminal prosecutions.

At the conclusion of the evidence, the court made the injunction permanent.

The main contention of the appellants is that the injunction was too broad in its restriction of alleged liberties of the strikers, and included certain defendants either not in court, or not shown to have been offenders.

Workers have the right to bargain collectively. This right must never be taken away from them. Without the right to strike, collective bargaining would be of no consequence whatever. The striker likewise has the right to talk to his fellow-employees, and, if he can, persuade them also not to work. But force, compulsion, threats, and violence against those who choose to continue their work, or others who seek to work, must not be tolerated. Without restraint against such pressures, anarchy could easily follow.

This was not an ordinary strike. The local union was predominately colored. The picture of colored men and women, threatening and wreaking violence upon white men and women as they entered the plant to continue or accept employment is vividly reflected in this record. There was a perfect setting for violence, as well as the explosion of racial tensions. The learned chancellor was fully warranted in seeing that a lighted torch was not thrown into a powder magazine.

██ █ As aptly said in Southern Bus Lines, Inc. v. Amalgamated Association of * * Employees, etc., 205 Miss. 354, 38 So. 2d 765: ''Peaceful picketing is a lawful act.'' But ''When any individual or organization under whatsoever name attempts to use force to gain his or her ends, they are attempting to usurp a governmental function. When a picket line becomes a picket fence, it is time for the government to act.'' ██ █ And ''No one should doubt that the State of Mississippi, through its courts by the injunctive process, can protect persons and properties in this state from damage by violence and from fear through threats and intimidation. Acts, which in isolation are peaceful, become part of a coercive thrust when entangled with acts of violence.'' Besides, ''The National Labor Relations Act does not preempt all state control, nor more specifically the state police power.'' See the many authorities, both state and federal, there cited.

Consequently the court was fully warranted in making the temporary injunction permanent.

■■■ The parent union, United Brotherhood of Carpenters & Joiners of America, was not lawfully served with process. The answer averred that Upton and Garner were not agents of the union for process. Upton testified that he was a special representative "assigned to organizing". Garner testified that he occupied virtually the same position as Upton. There was no proof by the complainant that these two employees were capable of receiving process. Neither did it enter its appearance, although it has appealed from the final decree.

There was no connection whatever between Locals 3056 and 569. No. 569 was not served with process. Neither did it enter its appearance. Besides there was no evidence that it had anything whatever to do with the strike.

Consequently the final decree of the trial court must be, and is, modified so as to exclude United Brotherhood of Carpenters and Joiners of America, AFL, and Local Union No. 569, from the prohibitions of the injunction. In all other respects, the decree is affirmed.

Affirmed, as modified.

*Roberds, P. J.,* and *Hall, Holmes* and *Ethridge, JJ.,* concur.