FISHERMEN AND ALLIED WORKERS, AN AFFILIATE OF NATIONAL MARITIME UNION, AFL-CIO, et al. *v.* QUAKER OATS COMPANY

No. 40954    February 23, 1959    109 So. 2d 321

*Morse & Morse,* Poplarville, for appellants.

*Morse & Morse,* Gulfport, for appellee.

Holmes, J.

This litigation involves a controversy between The Quaker Oats Company and the Fishermen and Allied Workers, an affiliate of National Maritime Union, AFL-CIO.

The Quaker Oats Company is a New Jersey corporation qualified to do business, and doing business, in Pascagoula, Jackson County, Mississippi.

The Fishermen and Allied Workers, an affiliate of National Maritime Union, AFL-CIO, is a labor union having its principal place of business in Biloxi, Harrison County, Mississippi, and doing business in Jackson County, Mississippi.

The Quaker Oats Company, as complainant, instituted this action in the Chancery Court of Jackson County, Mississippi, against the said labor union and its president and secretary as defendants, seeking the issuance of an injunction to enjoin the defendants from picketing the complainant's place of business in Pascagoula, Mississippi.

The original and amended bills of complaint alleged that on November 16, 1957, the complainant was engaged

in the manufacture of Puss'n Boots Cat Food from trash fish as one of its ingredients; that at said time the complainant's employees were members of the International Chemical Workers Union, Local No. 504, with which union the complainant had a contract; that the complainant never had a contract with the defendant union and has never had a controversy with the defendant union; that on the morning of November 16, 1957, the defendants caused to be placed pickets on the premises of the complainant bearing placards or signs inscribed as follows: ''Quaker Oats Company unfair to organized labor. AFL-CIO, Fishermen and Allied Workers''; that the said defendants were continuing to so picket the premises of the complainant; that said picketing was being done for the following unlawful purposes: (1) To damage or destroy the complainant's business in Pascagoula, Mississippi, pursuant to an unlawful conspiracy; (2) to intimidate the complainant's employees and persons supplying complainant with trash fish by using placards or other writing, or verbally attempting by threats, direct or implied, to induce the employees of the complainant to abandon their employment; (3) and the defendants, in carrying out said picketing, were wrongfully trespassing upon the property of the complainant; that the picketing was, in addition, for the following unlawful purposes: (a) To restrain trade and commerce, (b) to limit or increase the price of complainant's product, (c) to limit or reduce the production of complainant's product, (d) to hinder competition in the production or output of complainant's product, (e) to restrain or attempt to restrain the freedom of trade or production of complainant, (f) to monopolize, or attempt to monopolize, the production of raw materials used by complainant in the manufacture of its product and otherwise conspiring to violate the laws of the State of Mississippi regulating trusts, combine and labor; that the complainant's product was transported to and from the complainant's premises by the

L. & N. Railroad Company, which had a service track into the complainant's place of business, and by trucks, and that the picketing was having the effect of interfering with the transportation of merchandise or products to and from the complainant's place of business, and that if the picketing is permitted to continue, it will seriously and injuriously affect the business of the complainant for the reason that the train crews and truck drivers have refused to cross the picket line; that the controversy between the complainant and the defendants is not a labor dispute affecting interstate commerce, and that the State court is vested with jurisdiction to decide the same; that the complainant is entitled to an injunction to restrain the defendants from picketing the place of business of the complainant, and that unless the said defendants are so restrained, the complainant will suffer irreparable injury to its business, and that it is without an adequate remedy at law.

The chancellor issued the temporary injunction as prayed for. The defendants answered the original and amended bills of complaint and denied the material allegations thereof, and moved the court to dissolve the temporary injunction and further filed a plea to the jurisdiction of the court, alleging that the controversy in question constituted a labor dispute affecting interstate commerce, and that the exclusive jurisdiction of such controversy was vested in the Labor Management Relations Act of 1947 (29 U. S. C. A., Sec. 151, et seq.).

After a hearing, the chancellor overruled the plea to the jurisdiction of the court and the motion to dissolve the temporary injunction and entered a decree making the injunction permanent, and it is from this decree that this appeal is prosecuted.

The appellant contends on this appeal that the controversy involved is a labor dispute affecting interstate commerce within the purview of the Labor Management Relations Act of 1947, and that in the absence of violence,

threats or coercion, the state court was without jurisdiction to adjudge the controversy, and that such jurisdiction was vested exclusively in the National Labor Relations Board. The appellee does not controvert this contention, or the authorities cited in support thereof, if it be conceded that the controversy involved is a labor dispute affecting interstate commerce. We need not, therefore, review the several cases cited by the appellant in support of its contention. But the appellee says that the controversy is not a labor dispute affecting interstate commerce within the purview of the Labor Management Relations Act (29 U. S. C. A., Sec. 151, et seq.), and that, therefore, the doctrine of federal pre-emption does not apply, and the state court was not without jurisdiction to hear and determine the controversy.

The position of the parties, therefore, simplifies the issues presented to this Court for decision. We concern ourselves only with the questions whether or not the complainant was engaged in interstate commerce, and whether or not the controversy between the parties was a labor dispute affecting interstate commerce within the purview of the Labor Management Relations Act. It becomes pertinent in the consideration of these questions to consider the facts as disclosed by the record before us.

The appellee, The Quaker Oats Company, had its plant and principal place of business at Pascagoula, Mississippi. It employed approximately 103 employees who were inside workers at the plant. The company was engaged in the processing, production and distribution for sale of Puss'n Boots Cat Food. The product was processed and produced at the company's plant in Pascagoula, Mississippi, and was shipped out to different states by rail and truck for sale to customers. The ingredients used in the product were scrap fish and cereals. The product was put up in cans. The cereals came from The Quaker Oats Company in Memphis, Tennessee. The cans were obtained from the Continental Can Company of Harvey, Louisi-

ana. The trash fish were bought by The Quaker Oats Company from George Castigliola, who with Vincent Castigliola was doing business as Castgliola Shrimp Company in Pascagoula, Mississippi. Under the terms of the agreement which The Quaker Oats Company had with George Castigliola, the fish, which were caught by fishermen who were members of the boat crews plying waters in the Gulf of Mexico, were delivered at the plant of The Quaker Oats Company and there unloaded by employees of the said company. They were unloaded by means of a suction hose and taken from the wharf to the scales where they were weighed and the weight tickets were taken to George Castigliola, who paid the boat owners for the fish. The fishermen who caught the fish were members of the defendant union. The owners of the boats were not. The Quaker Oats Company bought the fish from George Castigliola and had no contact or dealings with the boat owners or the fishermen insofar as concerned its purchase of the fish.

Under date of November 13, 1957, W. J. Higginbotham, Secretary of the defendant union, addressed the following letter to Mr. Leonard Davis, Manager of the Quaker Oats Company:

"Mr. Leonard Davis, Manager,
"Coast Fisheries,
"Pascagoula, Miss.

"Dear Sir:

"The Fishermen and Allied Workers Union, an Autonomous Union within the National Maritime Union are the successors of the Old Gulf Coast Shrimper's and Oysterman's Association. As you probably know, all of the Fishermen who fished for you when you first started operations in Pascagoula in 1952 were members of this Union. You also know that the Business Agent, Mr. Walter McVey, scheduled the boats for your Agent. That when your production was limited, the Union, with the

consent of your Agent, restricted each boat to five tons per boat per trip, etc. And relations between your company, your agent, and the Union were very cordial and we all prospered and grew larger. It has now been brought to our attention that an ever increasing number of outside boats have been brought in, thereby crowding out some of our local boats. Also that these outside boats are selling from three to five times more fish than the local boats. That our local fishermen are being replaced by Negro Fishermen from other states. It is this discrimination by your agent that the Union is gravely concerned. Your agent has used and abused our local fishermen to the point that the Union must take immediate action, we therefore ask that you meet with us November 15, 1957 in your office to discuss the necessary steps to eliminate these unjust conditions and to draw up an agreement whereby the fishermen of Pascagoula may claim their seniority rights, working conditions, and other benefits to which they are entitled.

> "sincerely yours,
> "s/s W. J. Higginbotham,
> Secretary"

On the next day, November 14, 1957, Mr. Davis replied to said letter, acknowledging the receipt thereof and stating that such letter would be answered in due course. On November 15, Higginbotham and two others representing the defendant union called at Mr. Davis' office for the purpose of discussing the complaints set forth in Higginbotham's letter of November 13, but were told by Mr. Davis' secretary that he was busy. The next day, the defendant union placed pickets at the place of business of The Quaker Oats Company. The record is unsatisfactory as to whether or not the pickets actually trespassing upon the property of the Quaker Oats Company, but it is deducible from the evidence that if they did so trespass, it was of a minor nature. The picketing was otherwise peaceable. The record is clear that there was

no dispute between The Quaker Oats Company and its employees, and no pressure was brought to bear by Quaker Oats Company upon the employees of said company with reference to joining or not joining the defendant union. It is undisputed from the evidence, however, that the presence of the pickets had the effect of preventing the train crews and the truck drivers from entering and leaving the premises of The Quaker Oats Company, and, therefore, had the effect of interfering with shipments moving in interstate commerce to and from the place of business of The Quaker Oats Company. This necessarily, if it had been permitted to continue, would have resulted in seriously injuring the business of The Quaker Oats Company and would have brought about a stoppage of or serious interference with the free flow of shipments to and from the place of business of The Quaker Oats Company.

Considering the facts of the case before us and the questions here presented, it is important at this point to consider the definition of the terms "commerce," "affecting commerce," and "labor dispute in commerce" as set forth in the Labor Management Relations Act of 1947 (29 U. S. C. A., Sec. 152, subsections (6), (7), and (9) ). These definitions are as follows:

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several states, or between the District of Columbia or any territory of the United States and any state or other territory, or between any foreign country and any state, territory, or the District of Columbia, or within the District of Columbia or any territory, or between points in the same state but through any other state or any territory or the District of Columbia or any foreign country."

"(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a

labor dispute burdening or obstructing commerce or the free flow of commerce.''

''(9) The term 'labor dispute' includes any controversy concerning terms, tenue or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment regardless of whether the disputants stand in the proximate relationship of employer and employee.''

██ ██ We think it cannot be successfully maintained that the appellee was not engaged in interstate commerce, and that such commerce would not be affected by the dispute. ⸱ The cat food which the appellee was engaged in processing and producing had for its ingredients scrap fish and cereals. The product was put up in cans. The cans were obtained from Louisiana; the cereals were obtained from Memphis, Tennessee, and the trash fish which were caught by the members of the defendant union in the waters of the Gulf of Mexico, were bought by George Castigliola and in turn sold by him to the Quaker Oats Company. The product when processed was shipped out to various states by rail and trucks to customers in different states. That The Quaker Oats Company was engaged in interstate commerce is well supported by the authorities.

In the case of N. L. R. B. v. Richter's Bakery, (C. C. A. 5th, 1944), 140 F. 2d 870, certiorari denied, 64 S. Ct. 1267, 322 U. S. 754, 88 L. Ed. 1584, it was held that a bakery whose products were sold and consumed locally but which purchased from sources outside the state raw materials valued at more than $60,000 which constituted twenty-five percent of the value of all raw materials used was engaged in ''commerce'', and subject to the Labor Management Relations Act.

In the case of N. L. R. B. v. Schmidt Baking Company, (C. C. A., 1941) 122 F. 2d 162, a baking company purchasing most of its materials and supplies in other states

than that wherein two of its three plants were located, making large interplant shipments of materials and supplies and delivering a substantial part of its products to customers outside the state was engaged in interstate commerce.

In the case of Wilson & Company v. N. L. R. B. (C. C. A. 1939), 103 F. 2d 243, it was held that a meat packer purchasing in the state most of the livestock slaughtered, but shipping most of the finished products outside the state, was engaged in interstate commerce so as to be amenable to the jurisdiction of the National Labor Relations Board.

The evidence is undisputed that the train crews and truck drivers engaged in transporting merchandise to and from the Quaker Oats Company's place of business were observing the picket lines, and thus it is apparent that the existence of the pickets affected injuriously shipments of merchandise to and from The Quaker Oats Company's place of business, and, therefore, resulted in a serious interference with the free flow of interstate commerce.

The further question is presented, however, as to whether or not the controversy between The Quaker Oats Company and the defendant union was a labor dispute within the purview of the Labor Management Relations Act. We think that it was. The letter which Higginbotham first addressed to The Quaker Oats Company's manager complained that ''an ever increasing number of outside boats have been brought in, thereby crowding out some of our local boats.'' It was further set forth in this letter that ''these outside boats are selling from three to five times more fish than the local boats.'' The letter concluded by resquesting a meeting on November 15, 1957, to ''discuss the necessary steps to eliminate these unjust conditions and to draw up an agreement whereby the fishermen of Pascagoula may claim their seniority rights, working conditions and other benefits to which they are entitled.'' Higginbotham testified that one of

the purposes of the union was to get the employees of Quaker Oats Company to join the Fishermen's union to the end that an agreement might be reached with The Quaker Oats Company obligating it to buy trash fish only from union members. Higginbotham further testified that there were legitimate complaints to be adjusted with reference to equal working hours, safety factors at the plant where the fish were unloaded, inaccurate scales on which the fish were weighed, deductions from the fishermen's pay for insurance and radio facilities. This evidence of Higginbotham shows that the dispute between the parties concerned terms or conditions of employment.

The definition of the term "labor dispute" in the Labor Management Relations Act of 1947 includes not only a controversy concerning the terms or conditions of employment but includes also a controversy "concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relationship of employer or employee." We think that the facts of this case bring the controversy here involved within the definition of a labor dispute as set forth in the act. Pertinent to this question and the facts of this case is the case of Wisconsin Employment Relations Board, Respondent, v. Chauffeurs, Teamsters and Helpers Local 200 of I. B. of T. C. W. & H. of A. F. L. and Another, Appellants; National Warehouse Corporation, Intervenor, 267 Wisc. 356. We quote from the statement of the case as set forth in 267 Wisc. pages 357-358, as follows:

"The complainant, National Warehouse Corporation, the intervenor here, is a Wisconsin corporation engaged in the general storage and warehousing business in Milwaukee, Wisconsin. It maintains terminal and platform facilities on a railroad siding and also receives shipments by over-the-road trucks. Its out-of-state supply of goods

amounts to substantially in excess of $1,000,000 annually. The company employs 12 warehousemen, one of whom was a member of Local 200 of the Teamsters Union at the time of the organizational campaign here concerned. The employees of the company had been members of the union from 1937 until April 1948, when the contract expired. In 1948, a union authorization election was held by the National Labor Relations Board among the employees of the company, and the employees voted down the union by a vote of nine to two. In 1949, in the course of a general strike in the warehouse industry in Milwaukee, pickets appeared at the company premises. However, all of its employees continued to work, and upon the filing of charges of unfair labor practices against the union before the Wisconsin Employment Relations Board, the union immediately stopped picketing the National Warehouse. As a result of the continuance of nonunion workers at their jobs during the strike, it is alleged that the bargaining effect of the representatives of the union was lessened. Therefore, in 1952, orginzational activities were commenced at nonunion warehouses. Their employees were notified of meetings for the purpose of talking to them about the benefits of belonging to the union. The employees at National Warehouse did not attend the meeting of which they had been notified, and refused to listen to personal appeals. Thereupon the president of the union gave the order to picket the National Warehouse Corporation.''

Further stating the facts in the Wisconsin case, the Court said: ''They (the pickets) remained in cars parked outside the premises and waited until trucks doing business with the warehouse approached, at which time they approached the truck drivers with their signs. The picketing was peaceful at all times. All of the warehouse employees continued working and passed back and forth through the picket line. There was no dispute between the employer and its employees, and no pressure was put

upon its employees by the employer with regard to joining or not joining the union. However, the drivers of the trucks are practically all members of the union, and the effect of the picket line was that the movement of trucks in and out of the warehouse was entirely choked off, thus seriously injuring the business of complainant.''

The Court, citing the case of Garner v. Teamsters Union (1953), 346 U. S. 485, 74 S. Ct. 161, 98 L. Ed. 228, held that the National Labor Relations Board had exclusive jurisdiction of the controversy involved. In so holding, the Court further said: ''Picketing is one of the traditional labor techniques incidental to the achievement of collective bargaining, and therefore, if lawful, is protected by the act. *It makes no difference that, as in the instant case, the picketing takes the form of 'stranger picketing,' i.e., picketing of a primary employer by a union which represents other units in the same industry than the unit being picketed. In the course of development of labor law, the area of a labor dispute has been extended from that of employer and employee in a single unit of an industry or craft to the entire industry or craft.''* (Emphasis ours)

Continuing, the Court said: ''It will be seen, then, that there existed a bona fide 'labor dispute' in the instant case arising from 'stranger picketing' of the primary employer; and the definition of 'labor dispute' in the act itself makes this fact clear when it says that a 'labor dispute' includes 'any controversy concerning terms, tenure, or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms of conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.' ''

A leading case which is analogous in its facts to the case at bar and which supports the conclusion which we have reached is the case of Garner v. Teamsters Union,

346 U. S. 485. The facts as stated by the Court are as follows: ''Petitioners were engaged in the trucking business and had 24 employees, four of whom were members of respondent union. The trucking operations formed a link to an interstate railroad. No controversy, labor dispute or strike was in progress, and at no time had petitioners objected to their employees joining the union. Respondents, however, placed rotating pickets, two at a time, at petitioners' loading platform. None were employees of petitioners. They carried signs reading: 'Local 776 Teamsters Union (AFofL) wants employees of Central Storage and Transfer Company to join them to gain union wages, hours, and working conditions.' Picketing was orderly and peaceful, but drivers for other carriers refused to cross the picket line and as most of petitioners' interchange of freight was with unionized concerns, their business fell off as much as ninety-five percent. The court below found that respondents' purpose in picketing was to coerce petitioners into compelling or influencing their employees to join the union.''

The Court held that the dispute there involved was a labor dispute affecting interstate commerce and fell within the jurisdiction of the National Labor Relations Board. The Court said: ''Congress has taken in hand this particular type of controversy where it affects interstate commerce. . . . . It is not necessary or appropriate for us to surmise how the National Labor Relations Board might have decided this controversy had petitioners presented it to that body. The power and duty of primary decision lies with the Board, not with us.''

The appellee relies strongly upon the case of Columbia River Company v. Hinton, 315 U. S. 143. We think, however, that the essential facts in the Hinton case are materially different from the facts of the case at bar. As the Court pointed out in the Hinton case, ''the controversy here is altogether between fish sellers and fish buyers.'' Thus it is manifest that the controversy there involved

was not a labor dispute affecting interstate commerce within the prohibition of the federal act.

In the light of the views hereinbefore expressed, it is our conclusion that the court below was without jurisdiction to determine the question involved and that the controversy here involved was a labor dispute affecting interstate commerce and that jurisdiction of the same was vested in the National Labor Relations Board. Accordingly, the decree of the court below is reversed and judgment entered here dissolving the injunction and dismissing the suit of the appellee, and the cause is remanded for determination by the court below of the question of attorneys' fees claimed by the appellant on the dissolution of the injunction.

Reversed and judgment here and cause remanded.

*McGehee, C. J.,* and *Hall, Lee* and *Ethridge, JJ.,* concur.

LEE, J.

## ON MOTIONS

The appellee filed its motion to strike the court reporter's transcript of the evidence because the reporter received no notice to transcribe her notes. Thereupon the appellants filed a motion for a writ of certiorari to require the clerk of the chancery court to send up certain papers not included in the record. Their counsel made affidavit to certain facts in explanation of the defect, if any, in the giving of notice. Thereafter counsel for the appellee filed a motion, disputing some of the allegations of the petition for a writ of certiorari and the affidavit thereon, and moved for the trial of an issue of fact, under Sec. 1960, Code of 1942, Rec., arising out of the appeal.

These three motions have all been considered together.

■■ ■ The record shows that the final decree in this cause was rendered on December 13, 1957, and the term of court adjourned on December 21, 1957. But in the meantime, the clerk of the chancery court had received and marked filed on December 19, 1957, a copy of a notice,

dated December 17, 1957, addressed to: "Miss Maud Tilley, Court Reporter, 323 S. Pascagoula Street, Pascagoula, Mississippi," giving the style of this cause, and requesting her to transcribe her notes and file the same as the defendant desired to prosecute an appeal. It was signed by counsel, and on the bottom was notated: "cc: Chancery Clerk, Jackson County, Pascagoula, Mississippi," and "Morse & Morse, Attorney at Law, Gulfport, Mississippi."

In the record is the certificate by Marie F. Graves, Official Court Reporter, showing that she had correctly transcribed her notes taken on the trial of the cause, that she had notified counsel on both sides, and, "I further certify that no notice to transcribe was given to this reporter but notice was directed to a former reporter of this court."

Obviously what occurred was that the appellants gave notice to the court reporter, naming her as Miss Maud Tilley, when actually the name of the court reporter was Marie F. Graves, who had succeeded to this position and was actually the reporter, who took the notes of the evidence. The filing of a copy of the notice with the clerk on December 19, 1957, was substantial proof that the appellants attempted to give notice to the court reporter. The reason why it was not given to Marie F. Graves was that a mistake was made in addressing it to the former reporter, Maud Tilley, instead of to Marie F. Graves. If a transcript of the evidence had not been made up and filed, Marie F. Graves would have had ample justification therefor because the notice was not given to her. However, she made up and filed the same. While her certificate shows that "no notice was given to" her, it does show that "notice was directed to a former reporter of this court." Actually she was apprised of the desire of the appellants to appeal to the extent that she felt obligated to transcribe her notes; and this she did promptly and with such dispatch, that a three-volume record was filed in this Court on April 11, 1958.

The notice, under Sec. 1640, Code of 1942, Rec., is to be given to the court reporter. Where a litigant in good faith, attempting to give the required notice within the time provided by law, mistakenly gets the wrong name of the reporter, but also files a copy thereof with the clerk, and the reporter obtains such notice that, with prompt dispatch, she makes up and files the transcript, the evidence will not be stricken for the highly technical reason that a mistake was made in the name of the court reporter. In such instances, the adversary party can, in no way, be prejudiced.

The rationale, as given in Brewer v. Bank and Trust Company, 126 Miss. 351, 88 So. 770, seems to be applicable in this instance. The principle, which is recognized here, is not precluded by the rule announced and adhered to in Mayflower Mills v. Breeland, 168 Miss. 207, 149 So. 787; Jackson Opera House Company v. Cox, 191 So. 665; Rees v. Rees, 193 So. 334; McGee v. State, 203 Miss. 609, 35 So. 2d 628; American Creosote Works, Inc. v. Rose Brothers, Inc., 211 Miss. 173, 51 So. 2d 220; Ivy v. Robertson, 220 Miss. 364, 70 So. 2d 862; Booker v. State, 220 Miss. 527, 71 So. 2d 477; and other cases of similar import.

It has not been contended that the notes are incorrect. See Sec. 1643, Code of 1942, Rec.

In view of the conclusion which has been reached in this matter it follows that the three motions, which have been enumerated above, should all be overruled.

Motions overruled.

*Roberds, P. J.,* and *Hall, Kyle* and *Ethridge, JJ.,* concur.