McMahon *et al. v.* Milam Manufacturing Company

No. 41687 February 27, 1961 127 So. 2d 647

*Pyles & Tucker,* Jackson; *Robert Cohn,* Atlanta, Ga., for appellants.

*Mitchell & McNutt*, Tupelo, for appellee.

Lee, P. J.

The Chancery Court of Lee County, on the application of Milam Manufacturing Company, issued tempor-

ary and permanent injunctions against Russell McMahon and others, enjoining them from picketing the plant of the complainant; and the defendants appealed.

Milam Manufacturing Company, a Mississippi corporation, with its domicile at Tupelo in this State, is engaged in the manufacture of garments, Most of its production consists of garments which are made under its own label for sale to the general public. Since 1956, the company has manufactured certain garments for Texson Company, a corporation of San Antonio, Texas, and White Stag Manufacturing Company of Portland, Oregon, on a "cut, make and trim" basis, that is, these companies furnished the cloth and the labels, with the design for the garments, and Milam cut the cloth in accordance with the patterns, sewed the same together with the trimming, and placed the labels thereon. In other words, Milam furnished the thread and its machines and the labor to make these garments. Milam shipped the finished garments in bulk directly to Texson at San Antonio, Texas, or to White Stag Manufacturing Company at Portland, Oregon, as the case might be. In advance, Texson placed its orders for spring and fall lines.

So far as ownership was concerned, there was no relationship whatever between Milam and Texson. No stockholder, officer, or director of Milam owned any stock in Texson; and no stockholder, officer or director of Texson owned any stock in Milam. Texson in no way exercised supervision or control over Milam. Only twice during the three-year period from 1956-1959 have representatives of Texson even visited the plant of Milam, and the purpose, on those occasions, was merely to become acquainted. The two plants were hundreds of miles apart. The only relationship between the two corporations was that a small percentage of Milam's total production of garments went to Texson on the "cut, make and trim" basis, as above described.

Milam's total sales for the stated years, together with the corresponding sales to Texson and the relative percent thereof were shown to be as follows: 1956-1957: Total sales $1,102,847; sales to Texson, $25,392.62, or .0230 percent. 1957-1958: Total sales, $999,178; sales to Texson, $101,596.92, or .1016 percent. 1958-1959: Total sales $1,013,819.69; sales to Texson $127,478.12, or .1257 percent. The sales to Texson for the months of March and April 1959 were $10,619.53 and $9,241.56, respectively, whereas the sales to Texson for those months in 1958 were $13,114.39 and $8,873.26, respectively, thus showing that the sales for those two months in 1958 were greater than for 1959.

Milam's profit on its operation with Texson had approximated from 5 percent to 15 percent of the total cost thereof.

In February 1959, employees of Texson, under the leadership of International Ladies' Garment Workers Union, AFL-CIO, went on strike in San Antonio, Texas. The only notice which Milam had of that strike was a newspaper article which several of the officers of the company read after the strike had begun.

Subsequently, on March 6, 1959, at a time when there was no dispute whatever between Milam and its employees, none of whom were members of the union, and when there was no request that Milam take over or aid the strike-bound plant of Texson, pickets, under the direction of Russell McMahon, business agent of International Ladies' Garment Workers Union, who was acting under orders from the Atlanta office of the Union, appeared along the receiving driveway at Milam's with signs which read: "Texson-Milam Mfg. Co. on strike. International Ladies' Garment Workers, AFL-CIO". McMahon admitted that he was sent to Tupelo by his superiors for the purpose of directing "a strike, a picket line;" that he brought the "plackets" with him and wrote the above mentioned words thereon; that he was

informed that some people would meet him in Tupelo, and that five did so; that he knew that the employees of Milam were not on strike, "but I didn't know the connection that might be hatched up between Milam and Texson"; and that he supervised and directed the picketing, but that he carried no picket sign himself.

The truck lines, and other common carriers, which had previously handled Milam's incoming and outgoing shipments, refused to cross the picket lines which were established in front of the receiving entrance of the factory, with the result that all of such shipments were stopped. Consequently, on March 8, 1959, Milam rented a truck in order to get fabric into the plant and garments out of the plant to the carriers. The pickets observed everything that was done. They watched the loading and unloading; and had a little black book in which they were constantly writing. According to A. B. McConnell, Vice-President of Milam, every time the rented truck left the plant, two of the pickets followed it in a bluish, green Ford, with an Alabama license. He was certain of this because he said that, each time, he followed the Ford.

On one occasion, a Malone truck, with a shipment for Milam, was stopped at the front. Pickets talked to the driver and he left. McConnell and Paul Eason went out in search of the driver and found him at a service station, calling his home office in Birmingham. They finally persuaded the driver to return to the plant with Eason getting in the truck and accompanying the driver inside. After the truck was unloaded, the driver was afraid to cross back over the picket line and leave. So Eason rode out in the truck with him as far as the weighing station east of Fulton. McMahon and another picket followed them in the same Ford car all of that distance.

On another occasion, after North Mississippi Shippers Association had been employed by Milam to handle its freight, and one of its trucks was being loaded at the

west entrance loading dock, a car, from which McMahon disembarked, was parked on the wrong side of the street in front of the truck, so blocking the way that it was extremely difficult for the truck to get out of the yard. In fact it took ten to fifteen minutes for the driver to get his truck out of the plant, and this was not accomplished until after the truck collided with the car and then the driver of the car moved it. Notwithstanding an injunction was issued on March 20, 1959, picketing, by parties not named as defendants therein, continued; and, on April 6, 1959, another injunction was ordered to be issued. In both cases the injunctions prohibited picketing.

Robert Cohn, staff attorney for Local 180 of International Ladies' Garment Workers Union, of Atlanta, Georgia, admitted that, on April 17, 1959, he filed with National Labor Relations Board a charge of unfair labor practice against Milam. The union did not prosecute the proceedings on this complaint, and subsequently withdrew it.

The appellants assigned a number of alleged errors, but these have been compressed into the following contentions: (1) The controversy here was exclusively within the jurisdiction of the National Labor Relations Board, and the State court was without power to afford any relief whatever. (2) The final decree was in violation of the rights of the appellants, under the constitutions of both the State and Federal Governments. (3) The International Ladies' Garment Workers Union is unincorporated and was not properly before the court. And (4) certain procedural actions.

 █ It is true that, where there is a labor dispute affecting interstate commerce within the purview of the Labor Management Act of 1947, the jurisdiction of the controversy is vested in the National Labor Relations Board. 29 U. S. C. A., Sec. 151 et seq.; Garner v. Teamsters C. & H. Union, 346 U. S. 485, 74 S. Ct. 161, 98 L.

Ed. 228; P. S. Guss, d/b/a Photo Sound, etc. v. Utah Labor Relations Board, 353 U. S. 1, 77 S. Ct. 598, 609, 1 L. Ed. 2d 601; Youngdahl v. Rainfair, 355 U. S. 131, 78 S. Ct. 206, 2 L. Ed. 2d 151; and other authorities too numerous to mention. That principle has been recognized by this Court in Southern Bus Lines, Inc. v. Amalgamated Association of * * * Employees of America, et al., 205 Miss. 354, 38 So. 2d 765; United Brotherhood, etc. v. Pascagoula Veneer Co., 228 Miss. 799, 89 So. 2d 711; International Woodworkers v. Fair Lumber Co., 232 Miss. 401, 99 So. 2d 452; Fishermen & Allied Workers v. Quaker Oats Co., 235 Miss. 401, 109 So. 2d 321.

29 U. S. C. A., Sec. 152, subsection (9) provides as follows: ''The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment regardless of whether the dispurtants stand in the proximate relationship of employer and employee.''

The above subsection (9) is an exact rescript of 29 U. S. C. A., Sec. 113(c), p. 128, which was under consideration in Columbia River Packers Assn. v. Hinton, et al., 315 U. S. 143, 86 L. Ed. 750, 62 S. Ct. 520. Although the fish sellers were called a union and were affiliated with a national labor organization, actually they were independent operators; and it was held that a suit by the buyers of their fish, under the Sherman Act, was not a ''labor dispute'' within the meaning of the Norris-LaGuardia Act. The opinion said that this did not place in controversy the wages or hours or other terms and conditions of employment of the employees. It was therein said: ''We recognize that by the terms of the statute (the Norris-LaGuardia Act) there may be a 'labor dispute' where the disputants do not stand in the proximate relation of employer and employee. But the statutory classification * * * does not expand the application of

the Act to include controversies upon which the employer-employee relationship has no bearing." The opinion explained that, by the Norris-LaGuardia Act, the attention of Congress was focused upon "disputes affecting the employer-employee relationship, and that the Act was not intended to have application to disputes over the sale of commodities." See also Carpenters and Joiners Union, etc., v. Ritter's Cafe, 315 U. S. 722, 62 S. Ct. 807, 86 L. Ed. 1143.

In the present case, there was no employer-employee relationship between Milam and the strikers or the pickets. After all, they were simply irate because Milam had been delivering their employer .0230 to .1257 percent of its production.

In Fisherman and Allied Workers v. Quaker Oats Co., supra, this Court recognized that there was in fact, a labor dispute in that case. The appellants had begun to fish for the appellee in 1952. There was cooperation between the parties, and each boat was limited to five tons per trip. Then Castigliola came into the picture, ostensibly buying fish from the boat owners and selling it to Quaker. Outside boats were brought in and were permitted to sell three to five times as much fish as the local boats. It appeared that, even if Castigliola was in fact an independent contractor, at the same time, fish was unloaded and weighed at Quaker's plant just as had been previously done. Since legitimate complaints as to working hours, to safety factors, to inaccurate scales, and to deductions on account of insurance and radio facilities, could and did arise at the place of unloading—the same place where the fisherman had delivered their fish before the appearance of Castigliola—this Court held that there was a labor dispute in contemplation of Federal law. Inasmuch as the picketing was peaceful in that case, it was held that the State court had no jurisdiction. Besides in that case, the scene was Pascagoula, Mississippi. All of the affected parties lived there. There

was no difference in the place and manner of delivery of the fish and the attendant circumstances before and after Castigliola's appearance. To all intents and purposes the system was the same.

But, in the present case, people from other states, some of them living hundreds of miles away, came to Tupelo, Mississippi. These men and women did not work for Milam. It was not shown that any of them had ever worked for Milam. There had been peace and quietude at Milam's—no labor dispute, or dispute of any kind, existed between Milam and its employees. Some of these outsiders had worked for Texson, but others had not even been in its employ. There was no evidence that Milam was helping to break a strike at Texson, or that these people were trying to form a union, or trying to get the employees of Milam to join a union, or that they were trying to coerce Milam into influencing its employees to join a union.

Certain particular circumstances should be pointed out in the hereinafter mentioned cases, cited and relied on by the appellants:

In Youngdahl v. Rainfair, supra, Rainfair's trouble was with its own employees, none of whom actually belonged to a union, but many of whom had signed applications to join. Twenty-nine workers failed to report and a picket line was established in an effort to compel the employer to recognize the union.

In Garner v. Teamsters C. & H. Union, supra, four of Garner's twenty-our employees, belonged to the Teamsters Union. A picket line was thrown up, and the signs, borne by the pickets, read as follows: "Local 776 Teamsters Union (A. F. of L.) wants Employees of Central Storage & Transfer Co. (Garner's trade name) to join them to gain union wages, hours and working conditions."

In Guss, d/b/a Photo Sound Products Manufacturing Co. v. Utah Labor Relations Board, supra, the United

Steelworkers of America was certified as the bargaining agent for the employees of Guss, and the union filed charges with the Acting Regional Director of the National Board to the effect that Guss had engaged in certain proscribed unfair labor practices. The Director declined to issue a complaint. The Union then filed like charges with the Utah Labor Relations Board, which found that Guss had engaged in such practices. The Supreme Court of Utah affirmed. 5 Utah 2d 68, 296 P. 2d 733. The judgment was reversed by the Supreme Court of the United States and the case went off on the ground that the National Board had not ceded its jurisdiction.

In San Diego Building Trades Union v. Garmon, 353 U. S. 26, 77 S. Ct. 607, 609, 1 L. Ed. 2d 618, the respondents, operating lumber yards in San Diego County California, had purchased more than $250,000 worth of material outside of California to be sold at retail. They refused to sign a contract with the petitioner unions, including a union shop, because a majority of the employees had not selected a union as their bargaining agent. Then ''The unions commenced peaceful picketing to enforce their demand.'' Respondents sought an injunction in the state court, and filed a petition with the Regional Director of the National Board, asking that the representation of their employees be resolved. The injunction was granted and the California Supreme Court affirmed. But the Supreme Court of the United States, under the principle announced in the Guss case, supra, that is, that there was no cession of jurisdiction by the National Board, vacated the judgment.

In other words, in the Youngdahl, Garner, Guss and Garmon cases, supra, cited and relied on so strongly by the appellants, in each instance, there was a ''labor dispute'' between the employers and their employees, or the representatives of such employees. From the appellants' citation of authorities, the Court has been unable to find a case in which it has been held by the Supreme

Court of the United States that a "labor dispute" arises under the Labor Management Act of 1947 where no employer-employee relationship whatever exists or where such relationship is not susceptible of existing. Certainly this cannot be law when, in a case such as this, the director and the participants in the picket line were wholly alien to both the employer and the employees of Milam.

■■ The Court is, therefore, of the opinion that there was no "labor dispute" within the purview of the Labor Management Act of 1947.

■■ In a labor dispute, picketing, if peaceful, is lawful. However, if it is not peaceful, the state court may intervene. Always the question for determination is whether the picketing is peaceful. See 70 C. J. S., Picket; Picketing, p. 1052, where it is said: "In peaceful picketing there is an entire absence of fraud, violence, or anything of an intimidating nature, and it is characterized by peaceful persuasion for the promotion of a lawful purpose." See also Triangle Finishing Corp. v. Textile Workers, 145 N. Y. Supp. 2d 614, where it is said: "Picketing to be peaceful must be free, not only of violence, but also free of any intimidation, free of any form of physical obstruction or interference." See also Meltex, Inc. v. Livingston, et al., 145 N. Y. Supp. 2d 858, where it is said: "* * * picketing, in order to be peaceful, must be free, not only of violence, but, also, of *any* unlawful act, i.e., free of intimidation of customers, free of any form of physical obstruction or interference with business, and free of any misrepresentation of the facts of the controversy. Senn v. Tile Layers Union, 301 U. S. 468, 479, 57 S. Ct. 857, 81 L. Ed. 1229."

The use of force to gain the desired end constitutes an attempt to usurp a governmental function. ■■ The state, in the exercise of its police power, may, by injunction, protect persons and property from damage by violence and "from fear through threats and intimidation." Southern Bus Lines Inc. v. Amalgamated Association

of * * * Employees, supra. See also United Brotherhood, etc. v. Pascagoula Veneer Co., supra; International Woodworkers v. Fair Lumber Co., supra; Fishermen & Allied Workers v. Quaker Oats Co., supra; Allen Bradley Local, et al. v. Wisconsin Employment Relations Board, 315 U. S. 740, 62 S. Ct. 820, 86 L. Ed. 1154; United Automobile, etc. v. Wisconsin Employment Relations Board, 351 U. S. 266, 76 S. Ct. 794, 100 L. Ed. 1162.

In Youngdahl v. Rainfair, supra, the Supreme Court of the United States held that the Arkansas Court could lawfully enjoin the union and others from threatening or provoking violence and from obstructing or attempting to obstruct the use of the streets adjacent to the employer's place of business and the free ingress and egress to and from the property. In San Diego Trades Union v. Garmon, supra, and in Plumbers v. County of Door, 359 U. S. 354, 79 S. Ct. 844, 3 L. Ed. 2d 872, it was specifically found that the picketing was peaceful. In Hotel Employees Union, etc. v. Sax Enterprises, 358 U. S. 270, 79 S. Ct. 273, 3 L. Ed. 2d 289, it was pointed out that in none of the twelve Florida cases, which were then being reviewed, was there any finding of violence, while in some, there was an express finding of no violence.

The appellants in this case, pursuant to their purpose and intent to "hatch up" a connection between Milam and Texson, perpetrated a great fraud upon Milam when they paraded before its entrances with signs, which announced "Texson-Milam Mfg. Co. on strike. International Ladies' Garment Workers Union AFL-CIO," since they well knew at the time that the charge was false and that there was no dispute whatever between Milam and its employees and that the employees of Milam were not on strike. While they did not beat up anyone or utter aloud words expressing their intent to do so, at the same time, it must be remembered that they observed everything that was being done and constantly wrote in the

little black book. They even followed Milam's rented truck when it left the plant to obtain fabric or to make deliveries to public carriers. Paul Eason, the director of traffic for Milam, said that their conduct made him nervous and that the driver of the truck for the Malone Company was so badly frightened that he drove away from the plant and it was necessary for Milam's officers to go in search of him, and, when he was found, to ride into and out of the plant with him. Besides, as these officers accompanied him for a considerable distance, two of the men, who were acting as pickets, followed in their car, and McConnell felt it necessary to secure a State Patrolman to give safe conduct to the State line. When does conduct amount to coercion or intimidation? It is always for the triers of fact or the jury to determine whether conduct constitutes an overt act against which defense can be rightfully made. This Court has said that no definition of an "overt act" can be given. "It may be a motion, a gesture, conduct, or demonstration, or anything else which evidences reasonably" such design. And again that "trifles light as air when viewed alone may become fraught with deadly meaning when viewed in connection with all the preceding facts * * *." Hood, et al v. State, (Miss.), 27 So. 643. In Youngdahl v. Rainfair, supra, the Supreme Court of the United States in citing Chaplinsky v. New Hampshire, 315 U. S. 568, 86 L. Ed. 1031, 62 S. Ct. 766, as authority for the statement that "Words can readily be so coupled with conduct as to provoke violence", made this further observation: "But if a sufficient number yell any word sufficiently loudly showing an intent to ridicule, insult or annoy, no matter how innocuous the dictionary definition of that word, the effect may cease to be persuasion and become intimidation and incitement to violence." When, to the foregoing described conduct of the pickets, there is added the act of one of them in parking his car in such manner as to block, for a time, the big truck that was

trying to depart from Milam's plant, █ this Court is unable to say that there is not substantial evidence to sustain the learned trial court in enjoining the picketing because of coercion and intimidation.

 █ But, the appellants say, the injunction against picketing on their part denies their constitutional right of free speech.

The case of Carpenters & Joiners Union, etc. v. Ritter's Cafe, supra, seems to be the answer to that question. Ritter was the owner of Ritter's Cafe. He made a contract with Plaster to erect a building about one and one-half miles from his cafe. Because Plaster employed nonunion labor, members of the appellant union began to picket Ritter's Cafe. Their object, in so doing, was to compel Ritter to require Plaster to employ only members of the union. Members of all trades-unions refused to cross the picket line and Ritter suffered a curtailment of 60 percent in his business. The state court enjoined the picketing of the cafe. In upholding that action, the Supreme Court of the United States said: "As a means of communicating the facts of a labor dispute, peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals hav-

ing no relation to either the dispute or the industry in which it arose.''

Under the First Amendment to the Constitution of the United States, Congress can make no law abridging the freedom of speech, and this restriction is extended to the states by the Fourteenth Amendment. Also, by Section 13, Article 3 of the Mississippi Constitution of 1890, freedom of speech is to be held sacred in this state. However libel is not licensed under the guise of free speech. The right of prosecution for libel is given in that section. See also Sec. 2268, Code of 1942, Rec.

■■■ Appellants contend that International Ladies' Garment Workers Union, being an unincorporated association, was not properly before the court.

Without reference to whether the union was properly served with process, the fact remains that it entered its appearance in the cause. In the answer and demurrer, it was said: ''Now come Russell McMahon, Elmer Smith, Carmel Hayes and the International Ladies Garment Worker's Union, AFL-CIO, Defendants in the above styled cause, and for answer to the original bill for injunction say:''. There was a prayer by the defendants for dismissal of the original bill, with the signature of Anthony J. Sabella, ''Attorney for Defendant''. The service of process and other related matters are precluded by reason of the appearance of this defendant, as stated above. Miss. Central Railroad Co. v. May, 149 Miss. 334, 115 So. 561; Finklea Bros. v. Powell, 189 Miss. 454, 198 So. 293.

The complainant, at the close of its evidence, moved the court to cite the defendants for contempt and to fix a date for the hearing. The court deferred action thereon. The appellants assigned this as error, and contend that the court should have specifically overruled this motion.

■■■ ''A contempt proceeding is sui generis * * * and * * * even a breach of an injunction *may* be punished

before the equities in the principal case are settled * * *.''
12 Am. Jur., Contempt, Sec. 66, p. 433. (Emphasis supplied.) While the breach may be punished before the equities are settled, there appears to be no good reason why this may not be done after the equities are settled. ■■ ■ The Court is of the opinion that it is within the discretion of the trial court to determine if and when a charge for alleged contempt of court shall be heard.

■■ ■ The appellants contend that this cause was taken under advisement on May 7, 1959; that the final decree was not entered until January 14, 1960, more than six months from the date that it was taken under advisement; and that, therefore, under Sec. 1650.5, Code of 1942, Rec., the decree is invalid.

The above statute provides as follows: ''All chancellors or judges of the chancery or circuit courts of the State of Mississippi shall render their final decree on any and all matters taken under advisement by such chancellors or judges not later than six (6) months after the date when same are taken under advisement or not later than six (6) months after the date on which the chancellors or courts or judges set as the date when the final brief or memoranda of authority is required to be filed on or as to the cause taken under advisement, whichever is the latest date after the date on which the cause or case is taken under advisement.''

While Sec. 1650.5 does fix a time for the rendition of decrees and judgments, it does not invalidate the same where such decrees and judgments are not rendered within that period of time. In McMahon v. Milam Manufacturing Co., 237 Miss. 676, 115 So. 2d 328, this Court denied a petition and application by the appellants for a writ of certiorari to require the chancery clerk to send up the records in the case. The reason for the denial was that no decree had been rendered. But the opinion also observed ''that the Court still has authority to render a final decree in the cases at a future regular

term of the said chancery court.'' That opinion was handed down on November 9, 1959, and a final decree was thereafter entered on January 14, 1960, as stated above. Hence, the appellants' contention in this respect must be overruled.

It therefore follows that the decree of the trial court must be affirmed.

Affirmed.

*Kyle, Arrington, Ethridge* and *Rodgers, JJ.,* concur.

## ON MOTION ON MANDATE

Jones, J.

On February 27, 1961, this Court rendered an opinion affirming the issuance of an injunction by the Chancery Court of Lee County, Mississippi, for the reasons stated in the opinion in 127 So. 2d 647. Petition for certiorari was filed. The Supreme Court of the United States, on October 9, 1961, granted certiorari and without opinion stating its reasons remanded the case to this Court for further proceedings not inconsistent with that Court's opinion. The appellant, McMahon, has filed a motion in this Court asking for the entry of a judgment here, and asking that said judgment grant certain relief set out in said motion.

Milam Manufacturing Company has filed objection to the granting of the relief sought by appellant in this Court. We have received the mandate of the Supreme Court of the United States, and in accordance therewith, this case is reversed and remanded to the Chancery Court of Lee County for further proceedings not inconsistent with the mandate of the Supreme Court of the United States.

Reversed and remanded.

All Justices concur.