HATTIESBURG BUILDING AND TRADE COUNCIL, et al. *v.*
BROOME, et al.

No. 42504 May 13, 1963 153 So. 2d 695

*Knox W. Walker,* Hattiesburg, for appellants.

*Heidelberg, Sutherland & McKenzie,* Hattiesburg, for appellees.

LEE, P. J.

J. D. Broome, doing business as Broome Contracting and Maintenance Company, and ten others, being employees of J. D. Broome, filed their bill of complaint against Hattiesburg Building and Trades Council, a labor organization, whose place of business was in Forrest County, Mississippi, and six other local unions, as described in the bill, and Cecil T. Harvison and F. D. Conn, individuals.

The complainants, other than Broome, were men with families, and it was necessary for them to work in order to support themselves and their dependents. They charged that their right to work and earn such support had been interfered with by the defendants and was being interfered with and threatened at the time of the filing of the bill, by the unlawful acts of the defendants as described in their bill.

Substantial allegations of the bill were to the following effect: J. D. Broome was in the industrial maintenance business, and, among other constructions being performed by him, he was doing work for Pontiac Eastern Corporation at its Black Creek Refinery in Lamar County, Mississippi, in an extensive clean-up and repair operation, commonly called a "turn around"; that several hundred employees of various contractors

were also engaged in such work, and that it was imperative that the work should be done expeditiously; that the defendants at six o'clock, October 6, 1961, unlawfully and in violation of the rights of the complainants, placed picket lines at all plant entrances to the refinery; that pickets were placed at the said entrances carrying signs which falsely and slanderously purported to advise the public that Broome was unfair and refused to bargain with Hattiesburg Building and Trades Council; that the purpose, in so doing, was to force Broome unlawfully to enter into some kind of a contract which, in operation and practice, would require that his employees belong to labor unions against their will, and that his nonunion employees would be discharged unless they joined a labor union; that the complainants did not belong to a labor union and did not wish to belong, and that virtually all of Broome's employees were similarly situated; that this action was for the purpose of forcing a shutdown of work at the refinery and placing pressure on Broome and the individual complainants to coerce them, against their will, into becoming members of a labor organization, all in violation of their rights and in violation of the statutes and Constitution of the State of Mississippi and the public policy of the State; that, following the placing of pickets, great congestion existed and danger to the traveling public and to individuals was greatly increased; that Broome, in past contracts had been threatened with violence and intimidated by Hattiesburg Building and Trades Council, and affiliated unions, in an effort to force him to sign an unlawful contract, as aforesaid, and during the construction of the Pontiac Eastern Corporation plant, when acts of violence were committed by defendants F. D. Conn and the defendant, Plumbing and Pipe Fitters Union; and that, in connection with unlawful picketing, Broome received threats of sabotage and damage to his property unless the demands were met.

It was further charged that there was no labor dispute whatsoever between Broome and his employees, and that the defendants did not represent his employees and that the complaining employees did not desire to be represented by them; that neither was there any labor dispute between Pontiac Eastern Corporation and its employees; that the unlawful acts of the defendant had caused several hundred employees of Pontiac Eastern Corporation and other contractors engaged in the work to leave the premises, or refuse to enter the same, and virtually brought about the shutdown of the work; and that this was causing damage and loss to the citizens of Lamar and Forrest Counties and other citizens in wages in the sum of several thousand dollars each day and the complainants were being injured and will be irreparably damaged unless the court would immediately enjoin and restrain the same.

There was a prayer for the grant of a temporary injunction and for the prevention of the acts and wrongs complained of.

The petition was sworn to by the parties and filed. A temporary injunction was ordered to be issued by the circuit judge of the 15th Circuit Court District of the State on the 6th day of October 1961 upon the giving of a good and sufficient bond in the sum of $1,500. Pursuant thereto, a writ of injunction was issued out of the Chancery Court of Forrest County, Mississippi, on the same date.

Thereafter a motion to dissolve was duly filed on October 24, 1961. Subsequently an answer was filed by the defendants, denying the material allegations of the bill and also setting up affirmative defenses, which, in effect, stated that the bill of complaint upon the face, alleged a controversy, or labor dispute, within the meaning of the National Labor Relations Act, 29 U. S. C. A., Sec. 151, and that the court was without jurisdiction.

The court heard the evidence, pro and con.

James B. Duren, Refinery Manager of Pontiac Eastern Corporation, situated at Black Creek, Mississippi, testified that the company receives its crude oil only in the State of Mississippi. Its product had been, and was being, sold to Gulf Oil Corporation either at its refinery site or at its storage facilities in the Town of Collins, Mississippi. Thereafter, the purchaser could place the same in the Plantation pipelines which run through Collins from Baton Rouge, Louisiana to other states. The company had a collective bargaining contract with a labor union. The refinery has an annual shutdown, known as a "turn around", taking about fourteen days, which consists of a general repair of all parts in the plant. At that time there were longer schedules and work weeks. Outside persons were also employed on the job. October 6, 1961, was the crucial date in this operation. It was at this time that pickets showed up on the job, the purpose being to keep union employees away. On the west gate there was a sign reading "Entrance for Broome Contracting and Maintenance Company only, all others enter east entrance." The sign on the east gate read "Broom Contracting and Maintenance Company enter west gate only, all others enter here." In this case the picket signs stated "J. D. Broome Construction unfair, refuses to bergain, no contract. H.B.T.C. A.F.L. — C.I.O.", and were placed at both the west gate and the east gate entrance roads. The pickets were in the highway. When the picketing was instituted at the main gate, it prevented workmen of three other companies, Calalytic Construction, Hemby Electric, and Delta Tank, from working. Of the 440 people normally employed, 252 refused to cross the picket line. There was no dispute of any kind between Pontiac, or Calalytic, or Delta Tank, or Hemby Electric, or Broome, with their employees. The witness was aware that Hattiesburg Building and Trades Council was seeking to negotiate with Broome Contracting and Main-

tenance Company; but, in a telephone conversation, Mr. Harvison gave assurance that there was no likelihood of any dispute. It was the opinion of the witness that pickets were placed at the east gate, where all workers except Broome's were to enter, was to force Pontiac to bring pressure on Broome to continue negotiations with Hattiesburg Building and Trades Council. That morning there was a long line of automobiles in each direction from the building on both sides of the street. Most of the union employees refused to cross the picket line. The witness understood that union members are subject to discipline if they cross picket lines placed by the union. The loss on payroll for October 6th was $10,000 and for October 7th was $4,800.

J. D. Broome, who lived at Hattiesburg, Mississippi, testified that he was engaged in industrial and contract maintenance and contract work in Mississippi. He had been a member of a labor union from 1940 to 1951. Some of his employees at the time of the trial were union men and some were nonunion. His policy has been and is, that he is not concerned with the political or religious beliefs of his employees. He does try to see that local people get first preference at work regardless of whether members or nonmembers of a labor organization. In other words, one does not have to belong to or continue as a union man to get employment with him. Neither does he require him to be a nonunion man in order to do so. He was familiar with the organization over which Cecil Harvison presided, namely, the Hattiesburg Building and Trades Council. This experience began in 1958 when a Mr. Hannigan was first in charge. The demand upon him at that time was that some of his employees, namely, Slade, McCann, Boone, Lowery and Daughtery should be fired immediately or they would ''get me one way or the other.'' Their next requirement was that he use strictly union people — he was to contact the business agent, who

would supply the needs. The pressure from Harvison was of the same type although he was more diplomatic and had "a smiling way" about it. His pet expression was that you "get right with us." He met with Harvison and other representatives of labor on September 23, 1961. At that time Harvison told him, in explanation of the hiring hall procedure, "We hope that you will encourage" the men "to get right with us within two weeks or a short period of time."

This witness was familiar with the hiring hall procedure as it was exclusive in the labor union to which he belonged. It means simply this: An employer contacts the labor organization with which he has an agreement, for all of his personnel, and all of his personnel must belong to the labor union or. they do not work. This was the message that these representatives gave him. Defendants Touchstone, Word, Stringer, F. L. Purvis, Harry Beakes, and Cecil Harvison were all present at the time. They told him that they had allowed him to grow and that it was time for him. "to get right" with them. But all of the conversation was about his signing the exclusive. hiring hall procedure. He asked for a copy of the contracts, but, under various excuses, they never did grant his request and he had never seen them. About 9:30 on the night of October 4th, he received a telegram from Harvison, President of the Council. It informed him that, if the witness did not enter into a contract by six o'clock on the morning of October 6th, they were going to act and they hoped that a strike would not be necessary.

When he got out to the plant the next day, Touchstone, Stringer and F. L. Purvis were all there. His offered testimony about threats over the telephone by unknown persons was excluded. When he filed the bill of complaint, he did so in good faith, believing that violence would erupt on the picket line and that injury was imminent; and at the time of testifying, he was more strong-

ly of that belief than at the time of the filing of the suit. There was no labor dispute of any kind between him and his employees or between any of the other organizations and their employees about the work being done at that time. The only question was whether or not the witness would submit to the demands of the defendants.

On cross-examination, the witness emphasized that the labor representatives were trying to get him to fire employees who were working for him at that time and that this was the main thing that they had hounded him about; and that those people had to go before any discussion could be made; that Harvison wanted him to sign an exclusive hiring hall agreement whereby the unions would furnish all of his employees; that they meant for him to fire everybody else when they expressed the hope that ''he would encourage them to see things their way within a couple of weeks''; and that there was no question of wages and working conditions. Harvison, Touchstone, Wood, Stringer, and all of them had told him positively that there was no problem of labor dispute or money. He had not refused to bargain on any other contract because he had never seen one. He therefore justly accused the defendants of interfering with the rights of his employees and other men to work on his job by demanding that he sign an exclusive hiring hall procedure and give his present employees two weeks to get right with the union.

Leonard L. Slade, another complainant and employee of Broome, testified that he had belonged to a labor union nearly twenty-one years but did not belong to one at the time of the trial, and did not desire to do so. He said ''We did not want any union to represent us at Broome's.'' He was also familiar with the hiring hall procedure, under which the business agent sends the union men first and nonunion men only when there are no other union men, and they, in turn, put up the

requisite fee. He was present at Broome's conference with the Council Members on September 23rd, and said that the labor officials "did not come up" with anything definite except that they wanted Broome to sign an agreement "to get right". That was the main thing. They said they would be the ones to do the hiring and send men to do the job. Broome would call them, if he needed men, and they would supply the men. If he did not sign an agreement to "get right", they would take other steps. There was no labor dispute whatever between Broome and his employees at the time.

J. H. McCann, an employee of Broome since 1958, testified that he belonged to a union for fifteen years, but does not belong to one now and does not desire to do so. He severed his connection about four years ago. He was familiar with the policies and philosophies of unions. The hiring hall procedure meant that a person applying for a job presents his union book, and if he is in good standing, he is given a referral card to the person who has asked for employees, and without that card he cannot get work. The obligation of the business manager is to negotiate contracts. If business is slack and a member is in arrears, if he is given work, he must pay up his dues as he works. Broome's employees did not wish to be represented by any local union.

Aaron Clempts, an employee of Broome, had never been a member of a labor union and does not want to be a member. There was no dispute of any kind between Broome and his employees. All they wanted was to be left alone.

Several of the defendants were called as witnesses on their side. While some of their answers, on direct, were susceptible of the denial of an attempt to obtain a labor monopoly, without regard to the wishes of the workers, those potential denials were then equivocated by their explanations. For instance, Cecil T. Harvison,

President of the Hattiesburg Building and Trades Council, and Business Manager of the Plumbers and Pipe Fitters Union, testified that when Broome asked if his employees would be required to join a union, he replied ''No, but we would appreciate your encouraging them to join.'' He admitted his responsibility in connection with the pickets, the sending of the telegram and the instructions to the persons to carry the picket signs. Besides, but for the injunction, he would have kept the pickets walking. When pinned down, on cross-examination, to what the purposes of his negotiations with Broome were, he said: ''Well, the purpose of the negotiations with Mr. Broome was to try to get him to enter into an agreement with the local unions whereby they would supply him with qualified craftsmen to perform the type of work that he does.'' The purpose of the picket line was to advertise that Broome had no agreement and had refused to cooperate. He explained that the Council was an association of the organized craft in that area. He named the seven particular unions which are involved and said that the Council decides when a picket line is to be used, and the pickets are agents of the Council. He admitted that, in the past, he had worked for Broome and that he was a ''nice guy'' to work for. He also admitted that what he was anxious to obtain was the hiring hall procedure by which he or the local union would furnish to Broome the workmen for that particular type of work. In other words, Broome would call each local union, and the union in turn would furnish him the men and supply his workmen. They were asking him to enter into that kind of agreement. That is what Broome declined to do and refused to discuss with them. Subsequently this witness, when recalled by defense counsel for the evident purpose of modifying some of his damaging admissions, tried to say that he was not requiring Broome's workers to join the union, but he would appreciate Broome's ''en-

couraging" them to join. He then admitted that this so-called "encouragement" would come from their employer, who paid their wages, who assigned them to their jobs, who would promote them if they were worthy of promotion, and who could terminate their employment if he desired. He then admitted that his salary, as business manager, was paid from the initiation fees of $200 and dues of $10 per month.

Herman H. Wise, Business Manager of the Boilermakers and a defendant, admitted that he knew of no dispute between Broome and any of his employees and his participation in the vote to put up the picket line.

Jim Daniel Touchstone, Business Agent of the Carpenters Union, and a defendant, testified that the words on the picket sign were for the purpose of publicizing the fact that Broome did not have a contract with the Council.

Claude William Faulk, Asst. Business representative of the Engineers, testified that what he wanted Broome to do was to talk to him about a labor policy so that the witness could furnish him some employees. He said that Broome was unfair because he would not hire his men through the local union. What he wanted Broome to do was to let him furnish the people, tell him what kind of people he wanted, and let him furnish those employees.

J. O. Word, Business Manager of Electrical Local 1575 and a defendant, testified that he attended the meeting of the Council when the question of putting a picket line on Broome was acted upon. His desire was that his local would furnish Broome with his electrical employees. He wanted Broome to use his men, to show some qualifications as to being an electrical, licensed contractor. He wanted him to become qualified so that he could employ the members of his union. If Broome used these men, he would expect him to comply with the rules; and that building and trades is organized

labor. If a member in his union fits the job that is need-
ed, as business agent, he sends that member. Only when
a qualified union man is not available does he send a
nonunion man. The witness said that he did want Broome
"to get right." By "get right", he meant "get the
electrical contract and start using my men under our
working agreement." Again he said "I wanted him
to use our men * * * to sign our contract, he would
abide by our contract and our rules. Unless he did that,
he would not be right."

Homer L. Stringer, Business Agent of International
Hod Carrier and Common Labor Union and a defendant,
testified that the Council had been trying to negotiate
a contract with Broome but he would not go so far as
to agree to anything but asked for two or three weeks
in which to study it. He participated in the September
23rd meeting on the occasion of the strike vote. He
was with a man that "carried the picket line." What
he told Broome was that he would like to get his mem-
bers that he already had in the union and he did not
say that he was going to discriminate or enforce any-
thing. He said that Broome was "unfair to me" when
he would not agree to hire his men by calling H. F.
Stringer. "We wanted some of our people to work for
him and, if others would not belong to the union," we
wanted to act as agent to qualify the men, union or
no union.

There was no actual violence. All witnesses agreed
that a good union man will not cross a union picket line,
and that a member can be disciplined for that offense.
The salaries of the business agents of the unions were
paid from initiation fees and dues.

At the conclusion of the evidence, the court made the
following written findings and conclusions of law:

"A few of J. D. Broome's employees belong to labor
unions, but most of his employees do not. These non-
union employees of Broome do not want to belong to

labor unions and particularly do not wish to belong to any of the defendant unions. They wish to be left alone by the defendants, and desire to be free from interference and coercion by the defendants. Complainant Broome has followed and now follows a strict policy of not requiring either membership or nonmembership in labor unions by his employees and of avoiding any interference whatsoever with the freedom of choice of his employees in this regard, and he has consistently and frequently advised his employees that membership or nonmembership in any labor union was a matter for their own personal free choice.

"No dispute, controversy or grievance of any kind exists between J. D. Broome, on the one hand, and any of his employees, on the other hand, relating to wages, hours of work, working conditions, or any other matter relating to employment, or otherwise.

"The defendant labor unions and their respective representatives demanded that the complainant, J. D. Broome, enter into agreements with them which in actual operation, practice and effect would require that Broome employ only members of labor unions; that he employ all of his employees from and through the business agents of the defendant labor unions and that he give said labor unions an employment monopoly with reference to employees of Broome; that he force and coerce his nonunion employees to join the defendant unions against their wishes; that he discharge nonunion employees; and that he otherwise interfere with his employees' right of free choice with respect to membership or nonmembership in labor unions.

"The defendants and each of them did unlawfully conspire to place picket lines at entrances to places where the complainant, J. D. Broome, was performing work and to injure the business of the complainant Broome and to injure and interfere with the rights of the complainants and other employees of Broome and

did act in concert with each other, individually and collectively, and as representatives of their respective unions, for the unlawful purposes set forth in these findings.

"In furtherance of the conspiracy and as a result thereof, picket lines were placed by defendants on all plant entrances to Pontiac Eastern Corporation's Black Creek Refinery in Lamar County, Mississippi, where Broome was then performing some work, on October 6, 1961, and as an immediate and direct result, work at the refinery came to a virtual standstill, causing great loss and damage, and said pickets remained until removed by the temporary injunction issued herein on October 6, 1961. Said pickets would have remained and continued picketing at said locations, and elsewhere, except for the issuance of said temporary injunction. Although several defendants testified that their purpose in picketing was to advertise to the general public that they had some dispute with Broome, it is obvious from the evidence, and the court so finds, that in truth the real purpose of the aforesaid picketing was to bring pressure to bear on the complainant, J. D. Broome, to force Broome in turn to coerce his employees into joining labor unions against their will, and to force Broome to submit to the demands of the defendants * * *

"It is the public policy of the State of Mississippi that the right of a person to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization and that any agreement or combination between any employer and any labor union or labor organization whereby any person not a member of such union or organization shall be denied the right to work for an employer, or whereby which membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employ-

ment monopoly in any enterprise, is an illegal combination or conspiracy and is against such public policy.

"The actions and activities of the defendants were for unlawful purposes, contrary to the public policy, statutes and Constitution of the State of Mississippi, and in violation of the rights of the complainants."

The decree was in accordance with the above findings. It was agreed by the parties that the hearing would be treated as final, and from the decree entered, the defendants appealed.

The appellants assigned and have argued two points on this appeal, namely, the bill of complaint alleged upon its face a controversy or labor dispute within the meaning of the National Labor Relations Act, 29 U. S. C. A., Sec. 151, and the trial court was without jurisdiction to enjoin the defendants from all picketing, as Congress has preempted this field by the passage of the National Labor Relations Act as amended in 1947.

The appellants have cited a large number of Federal cases which have dealt with the extent of Federal preemption in the field of labor relations in business affecting interstate commerce.

This Court, in one of its own cases, Fishermen & Allied Workers, etc. v. Quaker Oats Co., 235 Miss. 401, 109 So. 2d 321 (1959), in recognition of Federal preemption in this field, following the rule in Garner v. Teamsters Union, 346 U. S. 485, 98 L. Ed. 228, 74 S. Ct. 161, and other Federal authorities, held that the State court, in that instance, was without jurisdiction, dissolved the injunction, and dismissed the bill of complaint. Moreover, this Court, in another of its own cases, International Woodworkers, etc. v. Fair Lumber Co., 232 Miss. 401, 99 So. 2d 452, upheld the power of the trial court to suppress violence, but, in recognition of, and following decisions of, the Supreme Court of the United States, especially Youngdahl v. Rainfair, Inc., 355 U. S. 131, 2 L. Ed. 2d 151, 78 S. Ct. 206, held that while the State

courts can regulate peaceful picketing, they cannot pro-
hibit it. To that end, mass picketing, because it had
been attended with violence, was enjoined; but the union
was allowed to place two pickets at each entrance of the
plant.

It was alleged and proved, and the chancellor found
as a fact, that there was no dispute, controversy or
grievance of any kind between Broome and any of his
employees with reference to wages, hours, working con-
ditions, or other matters of employment. It was like-
wise alleged, proved, and found as a fact by the chan-
cellor, that the defendants demanded that Broome enter
into agreements with them whereby he would employ
only members of labor unions through their business
agents and thus give them a labor monopoly, so far as
his employees were concerned; and that he would coerce
his nonunion employees into joining the unions, or dis-
charge them and interfere with the free choice of his
employees as to membership or nonmembership in labor
unions.

Enough of the evidence has been referred to in the
statement of facts, to show that an employment monopoly
of Broome's employees was the whole purpose of the
defendants' demands. ''To get right with them'' en-
tailed the firing of his nonunion men unless they would
become members within a specified time; and, after this
had been done, the business managers of the unions
would then furnish his employees. This, of course, meant
that Broome would nevermore be able to hire a nonunion
man for any purpose unless, perchance, it might be im-
possible to secure a union man for that purpose. The
very sign itself, carried by the pickets, namely, ''J. D.
Broome Construction unfair, refuses to bargain, no
contract. H.B.T.C. A.F.L. — C. I. O.'', proclaimed that
Broome was unfair because he refused to bargain for
a contract. And what was that contract? That he would
''get right'' with them in complying with the demands

for an absolute labor monopoly. Carrying out their previous threats, and as a reprisal for Broome's refusal of those demands, they placed pickets at both entrances to the refinery at a time when the repair work was at a crucial stage, thus expecting to bring him to his knees.

■■ ■ This Court has repeatedly held that a chancellor's finding of the facts is reviewable on appeal only when manifestly wrong. Griffith's Miss. Chancery Practice, Sec. 674, pp. 741-2 catalogues literally dozens of cases reaffirming this rule. The author shows that the rationale for the rule derives from the constitutional right of all litigants to have their issues of fact submitted to and passed upon by the jury or chancellor, according to the ordinary practices of the forum in which the case is for trial, and the like right of the successful party not to have his cause reviewed except upon the record there made and, in addition, not reversed except upon that record, and then only, unless it is clearly shown to be erroneous. He also points out another compelling reason at pages 742-3, to-wit: ''The opportunities afforded to the trial court are far better for arriving at correct conclusions and findings upon all the questions of fact. Of this matter our supreme court has said: — 'Here we have nothing but the naked record before us; there, in most cases, the parties themselves are in the presence of the court and testifying. The manner of testifying, and their appearance upon the witness stand, and many other things, are influential in determining the triers of fact;' or as said in another case: The decision of the chancellor where the evidence is conflicting will not be disturbed on appeal, since he is better able to determine the truth of the matter than the appellate court.''

■■ ■ From the reading of the evidence and its considered study, the court is of the opinion not only that the finding of facts in this instance is not manifestly

wrong, but also that the same is manifestly right, and that no other reasonable or rational conclusion could have been reached.

 ■ If Broome had complied with these ·demands and had entered into a contract with the defendants to that effect, an illegal combination and conspiracy to deny and abridge the right of ten of the complainants and other persons to work in this State would have been formed and entered into against the public policy of this State, and in violation of Chap. 249, Laws of 1954, Sec. 6984.5, Code of 1942, Rec., and Sec. 198-A, Art. 7 of the Mississippi Constitution.

Chap. 249, Laws of 1954, Sec. 6984.5, Code of 1942, Rec., provides as follows: "Denial or abridgement of work. — (a) It is hereby declared to be the public policy of Mississippi that the right of a person or persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization.

"(b) Any agreement or combination between any employer and any labor union or labor ·organization whereby any person not a member of such union or organization shall be denied the right to work for an employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be an illegal combination or conspiracy and against public policy.

"(c) No person shall be required by an employer to become or remain a member of any labor union or labor organization as a condition of employment or continuation of employment by such employer.

"(d) No person shall be required by an employer to abstain or refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment.

"(e) No employer shall require any person, as a condition of employment or continuation of employment, to pay any dues, fees or other charges of any kind to any labor union or labor organization.

"(f) Any person who may be denied employment or be deprived of continuation of his employment in violation of any paragraph of this section, shall be entitled to recover from such employer and from any other person, firm, corporation or association acting in concert with him by appropriate action in the courts of this state such actual damages as he may have sustained by reason of such denial or deprivation of employment.

"(g) The provisions of this section shall not apply to any lawful contract in force at the time of the passage of this act, but they shall apply to all contracts thereafter entered into and to any renewal or extension of any existing contract thereafter occurring.

"(h) The provisions of this section shall not apply to any employer or employee under the jurisdiction of the Federal Railway Labor Act.

"If any clause, sentence, paragraph, or part of this act, or the application thereof to any person or circumstances, shall, for any reason, be adjudged to be invalid, such judgment shall not affect, impair, or invalidate the remainder of this act, or the application thereof to any other person or circumstances, but such invalidity shall be confined in its operation to the portion of the act directly involved in the controversy in which judgment shall have been rendered or to the person or circumstances so involved, as the case may be."

Section 198-A, Amendment to Art. 7 of the Constitution of 1890, was proposed by Chapter 512, Laws of 1960, the Amendment was ratified by the electorate of the State at a special election held June 7, 1960, and was inserted into the Constitution by due proclamation

of the Secretary of State on June 22, 1960, as provided by Section 273 of the Constitution as amended. The amendment was held to have been validly adopted by this Court in Barnes v. Ladner, 241 Miss. 606, 131 So. 2d 458 (June 12, 1961.) It provides:

"It is hereby declared to be the public policy of Mississippi that the right of a person or persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization. Any agreement or combination between any employer and any labor union or labor orgaization whereby any person not a member of such union or organization shall be denied the right to work for an employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be an illegal combination or conspiracy and against public policy. No person shall be required by an employer to become or remain a member of any labor union or labor organization as a condition of employment or continuation of employment by such employer. No person shall be required by an employer to abstain or refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment. No employer shall require any person, as a condition of employment or continuation of employment, to pay any dues, fees or other charges of any kind to any labor union or labor organization. Any person who may be denied employment or be deprived of continuation of his employment in violation of any paragraph of this section shall be entitled to recover from such employer and from any other person, firm, corporation or association acting in concert with him by appropriate action in the courts of this state such actual damages as he may have sustained by reason of such denial or deprivation of employment.

"The provisions of this section shall not apply to any lawful contract in force on the effective date of this section, but they shall apply to all contracts thereafter entered into and to any renewal or extension of an existing contract thereafter occurring. The provisions of this section shall not apply to any employer or employee under the jurisdiction of the Federal Railway Labor Act."

 █ The Court is concerned with the object of this picketing. It was for an illegal purpose and in violation of the Constitution and Statutes of this State in reference to the right of persons to work in this State. The Court is mindful of the fact that, in Thornhill v. State of Alabama, 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736 (1940), the Supreme Court of the United States went a long way in justification of picketing as an exercise of free speech. The reason, assigned for the sweeping statements therein, was that the effect of the Alabama criminal statute "comprehends every practical method whereby the facts of a labor dispute may be publicized in the vicinity of the place of business of an employer." But the opinion left the door open for State regulation when it said: "It is true that the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants," citing Mr. Justice Brandeis in Duplex Printing Press Co. v. Deering, 254 U. S. 443, at 488, 65 L. Ed. 349, 365, 41 S. Ct. 172, 16 A. L. R. 196.

Subsequently, however, the opinion came down in Giboney, et al. v. Empire Storage & Ice Co., 336 U. S. 490, 93 L. Ed. 834, 69 S. Ct. 684 (1949). Appellants, as members and officers of a labor union, in an effort to bring all retailers of ice into the union, and having

previously obtained an agreement from all other Kansas City wholesale ice distributors that they would not sell to nonunion peddlers, stationed pickets at Empire's place of business to bring it around to their view when it adamantly refused to make a like agreement. The state courts of Missouri, having enjoined such picketing because the attempted combination was held to be a conspiracy in restraint of trade, and a felony under Missouri law, Giboney and others appealed to the Supreme Court of the United States, contending that they had the right, under the First and Fourteenth Amendments to picket because there was "a labor dispute existing" between the parties and "the picketers publicized only the truthful information that appellee was 'selling ice to peddlers who are not members of the said defendant's union.' " Mr. Justice Black, in a clear and apparently unanswerable opinion, without a dissent, held "That states have constitutional power to prohibit competing dealers and their aiders and abettors from combining to restrain freedom of trade is beyond question." He pointed out, in effect, that a labor union enjoys no immunity from the violation of a valid criminal statute by reason of the guaranty of freedom of speech and press. In response to the contention that they were publicizing a fact, he pointed out that the record did "not permit this publicizing to be treated in isolation. For according to the pleadings, the evidence, the findings and the argument of appellants, the sole immediate object of the publicizing adjacent to the premises of Empire * * * was to compel Empire to agree to stop selling ice to nonunion peddlers." Explaining that the Court had already in Thornhill v. Alabama, supra, recognized the power of a State to set the limits of permissible contest open to industrial combatants in its citation of Justice Brandeis in the Duplex Printing case, supra, Justice Black then quoted the following language from the opinion in Duplex Printing, to-wit: "The con-

ditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature which, while limiting individual and group rights of agression and defense, may substitute processes of justice for the more primitive method of trial by combat.''

The opinion justified the restraint of picketing, under the circumstances in that case, because it was ''done in violation of Missouri's valid law for the sole immediate purposes of continuing a violation of law.'' Actually ''They were exercising their economic power together with that of their allies to compel Empire to abide by union rather than by state regulation of trade.'' The author cited Bakery & P. Drivers & Helpers, I. B. T. v. Wohl, 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816, which said in part: ''Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation.''

In Hughes, et al. v. Superior Court of California, 339 U. S. 460, 94 L. Ed. 985, 70 S. Ct. 718 (1950), the State courts had enjoined the picketing of a store in order to compel submission of the owner to a demand for employment of Negro clerks in proportion to the number of its then Negro customers. The appellants were adjudged guilty of contempt for violation of the injunction. They appealed, claiming that the injunction was invalid because it infringed their constitutional right of free speech. Mr. Justice Frankfurter, writing the opinion, pointed out that, while picketing is a mode of

communication, it is inseparable something more and different, and that a state is not required to tolerate even peaceful picketing by an individual in all places and all circumstances, citing Bakery, etc. v. Wohl, supra, and other cases. Since the State had, through its courts, expressed hostility to discrimination in employment on the basis of color, "It is not for this court to deny to California that choice among all 'the various weapons in the armory of the law.' " Consequently the judgment was affirmed. There was no dissent. Justices Black and Minton were of the opinion that the case was controlled by the Giboney case, supra. Mr. Justice Reed was of the opinion that the California court held that the pickets sought discrimination in favor of the Negro race, and that this was unlawful in that state, and picketing should be barred on that account, in accordance with the Giboney case.

In Building Service E. I. U. v. Gazzam, 339 U. S. 532, 94 L. Ed. 1045, 70 S. Ct. 784 (1950), the representatives of the unions called upon Gazzam to sign a contract which would require his fifteen employees at the Enetai Inn to join their union. He told them that this was a matter for his employees to decide. After discussions, when eleven voted, nine of them voted against joining, one was undecided, and the other, the bell boy, whose membership the union did not desire anyway, voted to join. As a result, Gazzam was notified that he had been placed on the "We do not patronize" list, and two pickets began walking in front of the hotel with signs reading "Enetai Inn — unfair to organized labor." The union finally offered a contract under which the present employees would not be required to join in order to continue their employment; but those hired in the future would be required to join within fifteen days or be discharged. The Court said that this latter offer was the same as the first in slow motion.

Observing that picketing is more than free speech, the opinion, in proof that it had not hesitated to uphold a state's restraint of acts and conduct which are an abuse of the right to picket rather than a means of peaceful and truthful publicity, cited Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 532, 132 A. L. R. 1200; Hotel & Restaurant Employees International Alliance v. Wisconsin Employment Relations Board, 315 U. S. 437, 86 L. Ed. 946, 62 S. Ct. 706; Carpenters & Joiners Union v. Ritter's Cafe, 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807; and Giboney v. Empire Storage & Ice Co., supra.

Because of the public policy of the State, enunciated by legislative enactment, as construed by the Supreme Court of the State, the opinion said that "it is clear that workers shall be free from the coercion, interference, or restraint of employers of labor in the designation of their representatives for collective bargaining", and that the picketing in this instance was "an attempt to induce a transgression of this policy." It was held that Giboney v. Empire Storage & Ice Co., supra, controlled, pointing out that, although in Giboney the law against unlawful picketing provided for criminal sanctions, that provision is not requisite as "Whether to impose criminal sanctions in connection with a given policy is in itself a question of policy." Justice Douglas took no part; but all other Justices concurred, Justice Black expressing the opinion that it was controlled by the principles announced in *Giboney*.

In Local Union No. 10, A. F. of L. v. Graham, 345 U. S. 192, 97 L. Ed. 946, 73 S. Ct. 585 (1952), the Grahams had a contract with the City of Richmond to build a school and had awarded contracts to various subcontractors, some of whom employed only union labor, while others employed both union and nonunion labor. As the work progressed, certain of the defendants requested that all nonunion labor be laid off and said, if that

was not done, every effort would be made to prevent any union labor to be employed on the project. To that end, they picketed the project with the sign, "This is not a Union Job." As a result, the union members quit and the project was slowed to a standstill. It was charged that this was a violation of the Virginia Right to Work Statute, and that the purpose was to prevent nonunion men from working on the project. The trial court made a finding of fact in accordance with the allegations of the bill and issued the injunction, which action, on appeal, was found to be plainly right by the Supreme Court of Appeals of Virginia. The opinion held that the Commonwealth of Virginia, consistent with the Constitution of the United States, had the right and power to enjoin picketing when it was carried on for purposes in conflict with the State's Right to Work Statute; and that the record justified the findings made by the State courts that the picketing was for such a purpose. The Virginia Statutes, Chap. 2, Acts of Ex. Session of 1947, Secs. 40-74 inclusive, were set out in the footnotes, and the court decisions, upholding them, were cited. The opinion called attention specifically to the testimony of the respondent Graham and his general manager on the factual question. Finally the opinion stated:

"Based upon the findings of the trial court, we have a case in which picketing was undertaken and carried on with at least one of its substantial purposes in conflict with the declared policy of Virginia. The immediate results of the picketing demonstrated its potential effectiveness, unless enjoined, as a practical means of putting pressure on the general contractor to eliminate from further participation all nonunion men or all subcontractors employing nonunion men on the project.

"Assuming the above conclusions to have been established, petitioners still contend that the injunction in this case was inconsistent with the Fourteenth Amend-

ment to the Constitution of the United States. On the reasoning and authority of our recent decisions, we reaffirm our position to the contrary. Building Service Employees International Union v. Gazzam, 339 U. S. 532, 94 L. Ed. 1045, 70 S. Ct. 784; International Brotherhood of Teamsters, C. & W. H. Union v. Hanke, 339 U. S. 470, 94 L. Ed. 995, 70 S. Ct. 773, 13 A. L. R. 2d 631; Hughes v. Superior Court of California, 339 U. S. 460, 94 L. Ed. 985, 70 S. Ct. 718; Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 93 L. Ed. 834, 69 S. Ct. 684; Thomas v. Collins, 323 U. S. 516, 537, 538, and 543, 544 (concurring opinion), 89 L. Ed. 430, 444, 445, 447, 448, 65 S. T. 315; Bakery & P. Drivers & Helpers, I. B. T. v. Wohl, 315 U. S. 769, 776, 777 (concurring opinion), 86 L. Ed. 1178, 1184, 1185, 62 S. Ct. 816; Carpenters & J. Union v. Ritter's Cafe, 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807; Carlson v. California, 310 U. S. 106, 84 L. Ed. 1104, 60 S. Ct. 736; Thornhill v. Alabama, 310 U. S. 88, 103, 104, 84 L. Ed. 1093, 1102, 1103, 60 S. Ct. 736; Senn v. Tile Layers Protective Union, 301 U. S. 468, 479-481, 81 L. Ed. 1229, 1236-1238, 57 S. Ct. 857. See also International Brotherhood, E. W. v. National Labor Relations Board, 341 U. S. 694, 705, 95 L. Ed. 1299, 1307, 71 S. Ct. 954." Justice Black dissented, but without an opinion. Justice Douglas was of the opinion that, if the purpose of the picketing was to deprive nonunion men of employment, it would be unlawful; but that if it was to keep men away from the job, it would have constitutional protection. He did not think that the record disclosed with certainty the purpose of the picketing and that it should be reversed for ascertainment.

Pappas v. Stacey, 116 A. 2d 497 (1955), a case from the Supreme Judicial Court of Maine, involved picketing solely for organizational purposes. The plaintiffs operated a restaurant, employing on an average of thirty persons. The defendants, officials of Local 390 of a

nationwide union, and three employees, who were members of that union, conducted peaceful picketing at the place of business for the sole purpose of seeking to organize other employees of the plaintiff in order to gain collective bargaining rights. The plaintiff was suffering and would continue to suffer damages, which would be irreparable. The question before the court was whether the law of Maine prohibited peaceful picketing for organizational purposes under the circumstances; and if so, whether such picketing was protected under the "free speech" provision of the Federal Constitution.

The opinion pointed out that, by a statute enacted in 1941, Chap. 292, an employee or worker is protected from "interference, restraint or coercion by their employers or other persons"; that the worker must be left free from interference as to whether he will join or refrain from joining a union; and that pressure could not be directed against the employer to force him to interfere in the free choice of his employees. But such a situation was exactly what this picketing amounted to. Consequently, it was unlawful.

On the question as to whether this would constitute an abridgement of free speech, the opinion cited, by way of limitation of the doctrine in the Thornhill case, supra, Annotations in 94 L. Ed. 976, 977, and cases cited in Building Service Employees International, Local 262 v. Gazzam, 339 U. S. 532, 94 L. Ed. 1045, 70 S. Ct. 784 (1950), particularly calling attention to the fact that, in the Gazzam case, it was held that a state may, without abridging the right of free speech, restrain picketing for a purpose unlawful under its laws and policies, even though a statute expressing such policy has no criminal sanctions.

Consequently it was held that the trial court correctly enjoined the picketing in this case and affirmed such action.

On appeal of this case to the Supreme Court of the United States, 350 U. S. 870, 100 L. Ed. 770, 76 S. Ct. 117, the motion to dismiss was granted and the appeal was dismissed, with the notation that Justices Black and Douglas would note probable jurisdiction.

In International Brotherhood of Teamsters, etc. v. Vogt, 354 U. S. 284, 1 L. Ed. 2d 1347, 77 S. Ct. 1166 (1957), the trial court did not find from the mere affidavits, no oral evidence at all being taken, that the purpose of the picketing was to coerce, intimidate and induce the employer to force, compel, or induce its employees to become members of the labor unions; but it did grant an injunction because a Wisconsin Statute prohibited picketing in the absence of a "labor dispute." On appeal, the Wisconsin Supreme Court at first reversed; but, subsequently, on reargument, since the facts were undisputed, it drew the inference and made such a finding, and that it was an unfair labor practice under Wis. Stat., Sec. 111.06 (2) (b). The opinion relied on the Gazzam case and Pappas v. Stacey, supra.

On appeal, the Supreme Court of the United States in an opinion by Justice Frankfurter, expressing the views of five members of the Court, affirmed the decision of the State court. The opinion collated many of the cases, subsequent to the Thornhill case, supra, which reassessed the broad implications of that case and held that injunctions may be properly issued against peaceful picketing in the course of a labor controversy when such picketing is counter to valid state policy in the domain open to state regulation. Particularly named were the Giboney case, supra; Hughes v. California, supra; International Brotherhood of Teamsters, etc. v. Hanke, 339 U. S. 470, 94 L. Ed. 995, 70 S. Ct. 773, 13 A. L. R. 2d 631; the Gazzam case, supra; the Graham case, supra. The opinion, after analyzing these cases, observed that they "established a broad field in which a State, in enforcing some public policy, whether of its

criminal or its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy." Justice Douglas wrote a dissenting opinion, concurred in by Chief Justice Warren and Justice Black. While he did not say so, it is inescapable, from his words, that he did not think the affidavits sustained the finding of the Wisconsin Supreme Court. As a final statement in the ardor of his dissent, he said: "I would return to the test enunciated in Giboney — that this form of expression can be regulated or prohibited only to the extent that it forms an essential part of a course of conduct which the State can regulate or prohibit."

In the research of the present question, the Court has come across the case of Farnsworth & Chambers Co., Inc. v. Local Union 429, etc., 299 S. W. 2d 8, a case from the Supreme Court of Tennessee, involving the State's Right to Work Law, in which the issuance of an injunction by the trial court had been affirmed, and in which, on appeal to the Supreme Court of the United States, 353 U. S. 969, 1 L. Ed. 2d 1133, 77 S. Ct. 1056, the judgment of the Supreme Court of Tennessee was reversed on the authority of Weber v. Anheuser-Busch, Inc., 348 U. S. 468, 99 L. Ed. 546, 75 S. Ct. 480; Garner v. Teamsters, etc. Union, 346 U. S. 485, 98 L. Ed. 228, 74 S. Ct. 161. Another case with a like result is Curry v. Construction & Laborers Union, etc., 217 Ga. 512, 123 S. E. 2d 653, where the judgment of the Supreme Court of Georgia, on appeal to the Supreme Court of the United States, Local No. 438, etc. v. Curry, 371 U. S. 542, 9 L. Ed. 2d 514, 83 S. Ct. 531 (1963), was reversed.

The Tennessee case was heard on bill and answer thereto. According to the allegations of the bill, a representative of the labor union protested to the complainant that it was not hiring union labor and threatened to picket the plant if union laborers were not employed; that the complainant refused to employ union labor; and

that picketing resulted. Obviously the demurrer admitted the truthfulness of the allegations of the bill. It can be readily seen that the arbitrary refusal to employ any union labor would constitute discrimination against such labor, and the most sanguine advocate of a right to work law should not expect to rest securely on such an unstable foundation.

In the Georgia case, Curry & Company had a contract with the City of Atlanta for the construction of certain improvements to the city's sewage disposal facilities in which it was provided that ''Wages will conform with those being paid on similar types of work in the Atlanta area.'' There was a dispute as to how this controversy arose. According to the affidavit of complainant, Curry, when he told the union representatives that he would not use union members exclusively because his company was operating on an ''open shop'' basis, the threat was made that they ''would use every means at their command to see that we did use union workmen on our project.'' On the other hand, the unions recalled their requests for the complainants to raise their pay scales to those prevailing in the area. The complainants maintained, as the basis of their suit, that the unions had violated the State's Right to Work Statute. Conversely, the unions said that their sole purpose in picketing was to publicize the facts about the wages being actually paid, and show that the matter was within the exclusive jurisdiction of the National Labor Relations Board. The trial judge refused to grant an injunction. On appeal, the Supreme Court of Georgia, while finding that the picketing was peaceful and that the evidence was sufficient to sustain a finding that the complainants were not paying wages conforming with those paid on similar types of work in the City of Atlanta, nevertheless it concluded, on the whole record, that the picket was placed on the job for the purpose of forcing the employer ''to employ only union labor, or be unable

to comply with the terms of his contract * * * such picketing is for an unlawful purpose, and clearly a violation of the provisions of Code Annotated Supplement Section 54-804 * * *''. The Supreme Court of the United States said: ''The allegations of the complaint, as well as the findings of the Georgia Supreme Court, made out at least an arguable violation of Sec. 8 (b) of the National Labor Relations Act, 29 U. S. C., Sec. 158 (b)'', and reversed the cause.

These two cases appear to be wholly unimportant insofar as the cause now being dealt with is concerned. They have been mentioned for the purpose of demonstrating that, although of recent announcement, they apparently in no way impair the validity of State Right to Work statutes designed by the sovereign state to prevent picketing when the object of even peaceful picketing is for an illegal purpose and in violation of the public policy of the State.

 It is clear that *Giboney* established the principle that, if the purpose of even peaceful picketing is to attain an object which is in violation of the public policy of a State, it may be restrained by the State. The Court was unanimous. In Hughes v. Superior Court of California, supra, while there was no dissent and Justice Douglas did not participate, Justice Black, Minton and Reed emphasized the correctness of the decision in the Giboney case by concurring on the ground that the principles of that case were controlling in *Hughes*. In the Gazzam case, supra, Justice Douglas did not participate, nor was there a dissent. *Giboney* was one of the principal authorities relied on for affirmance, and Justice Black stated that he was of the opinion that the case was controlled by the principles in *Giboney*. In Local Union No. 10 A.F.L. v. Graham, supra, seven members of the Court affirmed. Justice Black dissented, but filed no opinion. Justice Douglas, in his dissent, thought the findings should have been more specific whether

the purpose of the picketing was to deprive nonunion men of employment, which would make the picketing unlawful (the governing principle of Giboney) or to keep union men away from the job, which had constitutional protection. In *Vogt,* supra, while there was a dissent by Justices Douglas, Black and Warren, they were contending that the majority opinion was a departure from *Giboney,* and were calling for a return to it. Unquestionably *Giboney* is a landmark in pointing out the definite boundaries between State and Federal authority and power in this field.

The people of Mississippi, by their chosen representatives, the Legislature, in a general effort to afford to its citizens and residents freedom of choice in employment, whether as union or nonunion members, such membership or nonmembership not being a condition precedent to employment, and to prevent any agreement or combination between an employer and any organization or union whereby a labor monopoly would be set up, enacted Chap. 249 of the Laws of 1954, supra. Not content with a mere legislative act, the people subsequently demanded that this right to work should be written into their Constitution. As heretofore stated, the issue was submitted as an amendment, received an overwhelming majority of approval, was written into the Constitution, and is now a part of the basic constitutional law of the State. In addition, its validity has been approved by this Court. In other words, the high policy of the State has been fixed by the people themselves. They did not include criminal sanctions, but such is not necessary. Building Service E.I.U. v. Gazzam, supra; International Brotherhood of Teamsters, etc. v. Vogt, supra.

In spite of this high policy of the State, the appellants, according to this record, flaunted the high policy of the State by seeking to obtain a contract from Broome for a labor monopoly over his workers, and, when Broome

refused to enter such conspiracy, they placed pickets at the scene of the work in an effort to bring him to his knees and force him and his employees to surrender to their demands. Undoubtedly, *Giboney* is a complete answer to the contention that the State courts do not have jurisdiction of this cause.

From what has been said, it follows that this cause must be, and it is, affirmed.

Affirmed.

All Justices concur.